# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

DOUGLAS  FUQUA,                    )
                                  )
     Plaintiff,                   )
                                  )
v.                                )      Case No.: 3:17-cv-1911-LCB
                                  )
BRETT  TURNER,  et al.,           )
                                  )
     Defendants.                  )

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Jimmy Collier ("Collier") has filed a motion for summary judgment (doc. 67) in this action.  Plaintiff Douglas Fuqua ("plaintiff") has filed a response (doc. 70), which the Court ordered him to re-file (*see* doc. 73)[1] to comply with Appendix II of the Uniform Initial Order.  Collier then filed a reply (doc. 74).  Therefore, the motion for summary judgment is ready for review.  For the reasons stated herein, the motion for summary judgment is granted.

## I.      BACKGROUND

Plaintiff initially filed this action against Bureau of Alcohol Tobacco, and Explosives ("ATF") Agent Brett Turner ("Turner"), ATF Agent Adam Nesmith ("Nesmith"), Sheriff of Colbert County Frank Williamson ("Williamson"), and

---

[1] After the Court ordered plaintiff to file a response that complied with the requirements of Appendix II of the Uniform Initial Order, plaintiff filed a response (doc. 72) and amended response (doc. 73) that appear to be identical.  The Court will therefore consider the amended response (doc. 73) because it was filed with supporting evidence.

Collier in their individual and official capacities, alleging various claims pursuant to 42 U.S.C. § 1983 ("Section 1983") and § 1985 ("Section 1985") and Alabama law. In particular, plaintiff appears to allege, against all defendants, a claim for conspiracy to violate the Fourth and Fourteenth Amendments to the United States Constitution (Count I); a claim for unreasonable search in violation of the Fourth Amendment (Count II); a Section 1985 claim for conspiracy to deprive Fuqua of his equal protection rights (Count III); and state law claims for unlawful entry and search, false arrest, and false imprisonment (Count IV). (Doc. 1, pp. 6-10).

Sheriff Williamson filed a motion to dismiss (doc. 7), which the Court granted (doc. 20). Therefore, Sheriff Williamson is no longer a party to this action. Collier also filed a motion to dismiss (doc. 16), which the Court granted (doc. 29). In particular, the Court dismissed all federal claims against Collier in his official capacity[2], and all claims against him in his individual capacity arising from a September 2015 inspection; the Court found that the individual capacity claims

---

[2] This action was reassigned to the undersigned on October 17, 2018. It is not entirely clear whether the state-law claims against Collier in his official capacity were dismissed as a result of this order (doc. 29). Collier moved to dismiss the state-law claims against him in his official capacity, but did not substantively address that issue in this brief. The Court's order addresses the official capacity claims in terms of the Eleventh Amendment, not state immunity. But the order also states, "All claims against Collier in his official capacity . . . are DISMISSED WITH PREJUDICE." (Doc. 20, p. 7). Additionally, plaintiff appears to understand that no official capacity claims against Collier remain (or else he abandoned them). In his brief, plaintiff states, "Collier having been sued in both the official and individual capacity, *the court having severed the official capacity by way of both the 11th Amendment and the State of Alabama state officials [sic] are immune from claims against them in their official capacity*." (Doc. 73, p. 9 (emphasis added). Plaintiff then only addresses Alabama immunity principles applicable to parties sued in their individual capacities. (*Id.* at 10-17 (discussing state-agent immunity and Section 6-5-338 of the Alabama Code)).

against Collier related to a November 2015 inspection would remain. (*Id.*).

Nesmith and Turner also filed a motion to dismiss (doc. 40), which was granted

(doc. 48). Thus, Nesmith and Turner are no longer parties to this action.

Therefore, the only defendant remaining in this action is Collier.

As an initial matter, the Court notes that plaintiff failed to correct the

deficiencies in his response (doc. 70) pursuant to its order (doc. 71). Almost all of

plaintiff's asserted facts are unsupported by any citation to record evidence. (*See,

e.g.*, Doc. 73, pp. 5-8). Furthermore, plaintiff's facts section is replete with

conclusory statements and arguments also unsupported by any record evidence.

The Court will take this into consideration when determining whether plaintiff has

shown that a material fact is genuinely disputed. Fed. R. Civ. P. 56(3) ("If a party

fails to properly support an assertion of fact or fails to properly address another

party's assertion of fact as required by Rule 56(c), the court may . . . consider the

fact undisputed for purposes of the motion . . . ."). The Court will also consider

whether – when asserting a fact is genuinely disputed – plaintiff has supported his

assertion by "citing to particular parts of materials in the record." Fed. R. Civ. P.

56(c) (1) ("A party asserting a fact cannot be or is genuinely disputed must support

the assertion by . . . citing to particular parts of materials in the record . . . .").

The Court also notes that Collier has submitted as evidence a report and

recommendation addressing a motion to suppress filed in a 2016 criminal action

against plaintiff; in that action, plaintiff was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Some of the events described in the report and recommendation are the subject of this civil action. It appears that Collier attempts to rely on the report and recommendation as a source of facts. Even though plaintiff has not filed a motion to strike the report and recommendation, the Court declines to consider as facts the findings in same. For one, the report and recommendation is simply that – a recommendation. Furthermore, the facts in the report and recommendation are not supported by citations to any evidence, much less evidence of record in this action. *Cf. Dudley v. City of Monroeville, Ala.*, 446 F. App'x 204, 207 (11th Cir. 2011) (unpublished opinion) ("Unsworn statements do not meet the requirements of Rule 56, so the district court could not—and properly did not—rely on the content of the citizen's statement."). The Court will, however, consider the only other evidence supporting the summary judgment filings in this action: the testimony under oath from Collier and Williamson at the hearing on the motion to suppress in the criminal action against plaintiff regarding events of which they had personal knowledge.[3] *See* Fed.

---

[3] The only evidence plaintiff filed in support of his amended response are (1) a memorandum opinion and order (doc. 29) entered by the Court in this action, which is already in the record; and (2) excerpts of testimony from Collier and Williamson from the suppression hearing in the underlying criminal case against plaintiff. Collier has provided the Court with the entirety of the testimony from Collier (doc. 67-2) and Williamson (doc. 67-3) from the same suppression hearing. Therefore, for ease of reference, the Court will cite to the suppression hearing testimony of Collier and Williamson that was filed by Collier.

R. Civ. P. 56(c)(4) (stating that an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated); *Vondriska v. Cugno*, 368 F. App'x 7, 8–9 (11th Cir. 2010) (unpublished opinion) ("In order to support a motion for summary judgment under Rule 56(e), testimony must be sworn, competent and on personal knowledge, and set out facts that would be admissible in evidence at trial.").

"The Pig" is a structure located at 625 Jarmon Lane in Leighton, Alabama. (Doc. 67-3, pp. 3-4). The Pig has been described as an unlicensed nightclub and gathering place; plaintiff also resided there. (Doc. 67-2, pp. 6-7, 9). Alcohol was also served at the Pig. (*Id.* at 15). Collier is a deputy state fire marshal employed by the State of Alabama Department of Insurance Office. (*Id.* at 2). Collier has held that position since February 2005. (*Id.*). Deputy state fire marshals "have full, general powers of peace officers" in Alabama. Ala. Code § 36-19-1. Part of Collier's duties as a deputy state fire marshal include fire origin and cause determination, termination of origin cause and of explosions, code inspection, and code enforcement, among other things. (*Id.* at 3-4). With respect to code inspections, there are certain structures that require annual inspections while others are inspected upon complaint. (*Id.* at 5). Collier receives complaints in a variety of ways, including by e-mail, phone call, or text message. (*Id.* at 6).

Although the Court has dismissed all claims arising out of the September 16, 2015, inspection and search of the Pig, the Court briefly recounts events occurring on that day to give the summary judgment facts context. On September 16, 2015, Collier received a phone call regarding the Pig from Williamson. (Doc. 67-2, pp. 6-7). Williamson has been sheriff of Colbert County since January 2015. (Doc. 67-3, p. 3). Williamson testified that there has been trouble with the Pig since he has been in law enforcement, including drug deals, alcohol sales, and illegal alcohol sales. (*Id*. at 4). Williamson testified that he has received complaints about the Pig at least once a week since he has been sheriff. (*Id*.). Those complaints were for things like people parking in the road and blocking it, noise, loud music, people yelling, screaming, fighting, and shooting guns. (*Id*.). Williamson shared concerns with Collier about overcrowding and large gatherings at the Pig. (Doc. 67-2, pp. 8-9, 53). Collier suggested that he perform a fire marshal inspection to see if the complaint was founded. (*Id*. at 9-10). It was Collier's understanding that the Pig was an unlicensed club. (*Id*. at 9).

Collier had safety concerns about conducting an inspection at the Pig alone due to prior complaints about it. (*Id*. at 11). Therefore, Collier requested that Williamson send someone to accompany him. (*Id*. at 55-56; Doc. 67-3, pp. 15-16). Ultimately, Williamson and other deputy sheriffs accompanied Collier to the inspection. (*Id*. at 11). Collier cannot recall whether Williamson told him that

plaintiff had been arrested earlier that day by a deputy sheriff that was also present at the inspection. (*Id*. at 10, 54-55). Williamson testified that, at the time of the inspection, he did not know that the deputy present at the inspection had arrested plaintiff earlier in the day. (Doc. 67-3, p. 16). Collier testified that the Alabama Code permits him to request additional personnel to be present. (*Id.*).

Collier went to the Pig to conduct his inspection; however, plaintiff was not there when Collier arrived. (Doc. 67-2, p. 12). Collier spoke to a man who was present at the Pig. (*Id.*). That man called plaintiff, and plaintiff came to the Pig. (*Id.*). When plaintiff arrived, Collier told plaintiff that he had been asked to do an inspection of the business and requested that plaintiff accompany him through the building. (*Id.*). Plaintiff complied. (*Id.*). Collier found approximately nineteen to twenty code violations at the Pig. (*Id*. at 24-27, 32-33). During his inspection, Collier observed a shotgun in the kitchen. (*Id.*). Collier also observed a shotgun in plaintiff's bedroom. (*Id*. at 28, 110). Following the inspection, Collier entered the information into his inspection program, CodePal. (*Id*. at 34). Once Collier enters information into the system, it generates a report that includes a date for a follow-up inspection or re-inspection. (*Id*. at 35-36). Collier testified that follow-up inspections should occur thirty to forty-five days later. (*Id*. at 36).

Collier conducted a follow-up inspection of the Pig on October 21, 2015. (Doc. 67-2, p. 37-38). Collier called plaintiff, and plaintiff met Collier at the Pig

and let him in.  (*Id*. at 81).  Collier did not request any law enforcement personnel escort him because he no longer had any safety concerns.  (*Id*. at 37).  Some of the code violations had been corrected, but some had not.  (*Id*. at 37-39).  The report created by Collier in conjunction with this visit generated a follow-up inspection for November 17, 2015.  (*Id*. at 39).

On or about November 3, 2015, Collier attended a meeting at the Colbert County Courthouse.  (Doc. 67-2, pp. 39-40).  Various agencies, including ATF, the local drug task force, and the State Bureau of Investigation, had representatives at the meeting; the police chiefs for Muscle Shoals and Tuscumbia and the Colbert County district attorney were also there.  (Doc. 67-3, pp. 23-24).  The meeting was convened to talk about the problems at the Pig and what could legally be done about them.  (*Id*.; Doc. 67-2, pp. 39-40).  Collier informed the group that he had a re-inspection that was scheduled to be performed in the next thirty days.  (*Id*. at 40).  During the meeting, Collier and at least Nesmith discussed conducting the re-inspection on November 16, 2015, because Collier was available that day and Nesmith was not available on November 17, 2015. (*Id*.at 40, 97).  Collier testified that the inspection was scheduled for November 16, 2015, to accommodate law enforcement.  (*Id*. at 97).  During the meeting, Collier stated that he had observed firearms at the Pig.  (*Id*. at 42).  No one at the meeting instructed Collier to open closets or look under beds and mattresses for firearms or otherwise told him how to

conduct his inspection. (*Id*.; Doc. 67-3, p. 24). Collier was to contact Nesmith, however, if he observed any firearms during his re-inspection of the Pig on November 16, 2015. (Doc. 67-2, p. 42).

On November 16, 2015, Collier performed a re-inspection of the Pig. (Doc. 67-2, pp. 46-47). No law enforcement officers were with Collier during this visit. (*Id*.). Plaintiff was not present when Collier arrived at the Pig on November 16, 2015, so Collier called plaintiff and asked plaintiff to meet him at the Pig. (*Id*. at 47, 82). Collier waited until plaintiff arrived. (*Id*.). When plaintiff arrived, Collier performed another inspection of the Pig. Plaintiff asserts, without pointing to any evidence, that Collier entered the Pig without valid consent (doc. 73, p. 13); however, there is nothing in the record regarding what transpired when Collier entered the Pig and what exactly was said between Collier and plaintiff as Collier entered the Pig. Collier, however, testified that with all his inspections he asks the owner to accompany him. (*Id*. at 109-10). Furthermore, Collier's testimony indicates that plaintiff accompanied him during the inspection. (*Id*. at 82). There is no evidence that plaintiff objected to the inspection. Collier did not have a search warrant.

Collier testified that he conducted a general fire marshal inspection like he had done in the past. (*Id*. at 97). During the inspection, Collier observed a shotgun in plaintiff's bedroom and a shotgun in the kitchen area. (*Id*. at 43, 100). Collier

testified that he told plaintiff to open the door to his "residence," which the Court interprets as plaintiff's bedroom located inside the Pig, and plaintiff complied. (*Id*. at 97).[4] Collier testified that he had searched plaintiff's bedroom on an earlier occasion to inspect for extreme hazards similar to the storing of a liquid propane gas cylinder and deep fryer that he had discovered in another inner room of the Pig. (*Id*. at 27). Collier sent Nesmith a text message informing him that firearms were present. (*Id*.). Collier photographed the firearms. (*Id*. at 97, 100). Collier also observed code violations. (*Id*. at 43-46). Collier testified that he did not expand the scope of his inspection to help law enforcement conduct a criminal investigation. (*Id*. at 105).

It appears that Nesmith obtained a search warrant for the Pig based, at least in part, on Collier's observations of the firearms inside of the Pig. (Doc. 67, p. 3 (fact undisputed by plaintiff)). The search warrant was executed, and three firearms and ammunition were recovered from the Pig. (*Id*.). It also appears undisputed that plaintiff was arrested at some point after the search warrant was executed for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *See United States v. Fuqua*, 3:16-cr-83-VEH-TMP (N.D. Ala.),

---

[4] Collier, citing to page 66 of his testimony at the suppression hearing (*see* Doc. 67-2, p. 27), asserts that he "asked" plaintiff for admission to his bedroom. (Doc. 74, p. 3). However, upon close review of Collier's testimony, it appears that Collier was referring to the inspection of plaintiff's bedroom on September 16, 2015.

Indictment (Doc. 1); (Doc. 67, p. 3) (fact undisputed by plaintiff)).[5]  There is no

evidence that Collier was involved in the execution of the search warrant or arrest

of plaintiff following same.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine

dispute as to a material fact that precludes summary judgment, a party opposing a

motion for summary judgment must cite "to particular parts of materials in the

record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ.

P. 56(c)(1)(A).

When considering a summary judgment motion, the Court must view the

evidence in the record in the light most favorable to the non-moving party and

draw reasonable inferences in favor of the non-moving party.  *White v. Beltram*

---

[5] The Court takes judicial notice of the indictment in the criminal case against plaintiff.  *See* Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."); *see also Olmstead v. Humana, Inc.*, 154 F. App'x 800, 803 (11th Cir. 2005) (unpublished opinion) ("A court may take judicial notice of another court order, at least for the limited purpose of recognizing the judicial action taken or the subject matter of the litigation.").

*Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "'Genuine disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (citing *Anderson,* 477 U.S. at 255). However, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In sum, the standard for granting summary judgment mirrors the standard for a directed verdict. *Anderson*, 477 U.S. at 250 (citing *Brady v. Southern R. Co.*, 320 U.S. 476, 479-480 (1943)). The district court may grant summary judgment when, "under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250. "[T]here is no issue for trial unless there is sufficient evidence

favoring the nonmoving party . . . .  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (internal citations omitted).

## III.  DISCUSSION

Collier moves for summary judgment on all counts in the complaint.  Collier argues that he is entitled to qualified immunity from the federal claims against him.  Collier also asserts that he is entitled to state immunity and state agent / peace officer immunity from the state-law claims.  The Court will address each argument in turn.

### A.  Qualified immunity

Plaintiff brings three claims against Collier based on federal law.  In Count I, plaintiff alleges that Collier conspired with Williamson and the other defendants to enter plaintiff's residence without probable cause or a search warrant for the purpose of shutting down the Pig.  Although plaintiff brings this claim under the Fourth and Fourteenth Amendments, the Court finds that the Fourth Amendment is the proper amendment for it to consider because it expressly protects citizens from unreasonable searches and seizures and also mandates that warrants issue upon probable cause.  *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment,

not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."); *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1290 (11th Cir. 2001) ("Appellees must rely on the Fourth Amendment, the explicit constitutional text that protects citizens from searches and seizures."). In Count II, plaintiff alleges that Collier searched the Pig and/or his residence without probable cause and a search warrant. In Count III, plaintiff alleges that Collier violated 42 U.S.C. § 1985(3) by engaging in a conspiracy to shut down the Pig and to arrest plaintiff.

Collier argues that he is entitled to qualified immunity from plaintiff's federal claims. The doctrine of qualified immunity operates to shield from liability government officials performing discretionary functions. *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009). The purpose of qualified immunity is to ensure that government officials are not required to "err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotations and citations omitted).

To receive qualified immunity, the public official carries the initial burden of demonstrating that "he was acting within the scope of his discretionary authority

when the alleged wrongful acts occurred." *Courson v. McMillan*, 939 F.2d 1479, 1487 (11th Cir. 1991). A court assessing whether a defendant's actions fall within his discretionary authority asks whether the defendant was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex. rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

In the present case, it is clear that Collier was acting within his discretionary authority at all relevant times. Indeed, plaintiff does not dispute that Collier was engaged in a discretionary function during the relevant times. (Doc. 73, p. 21 ("The burden shifts to Mr. Fugue [sic] to show that marshal Collier's [sic] actions violated clearly established constitutional law.")). The burden therefore shifts to plaintiff "to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194.

The United States Supreme Court has set forth a two-part test for determining the appropriateness of a qualified immunity defense. *See Saucier v. Katz*, 533 U.S. 194 (2001), *receded from by Pearson v. Callahan*, 555 U.S. 223 (2009). Under *Saucier*, a court must ask, "[t]aken in the light most favorable to the

party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If, assuming the plaintiff's version of the facts as true, a constitutional right would have been violated, the court must then determine "whether the right was clearly established." *Id*. In *Pearson*, the United States Supreme Court held that courts may exercise their discretion in applying the two-part test under *Saucier* in whatever order is best suited to the facts of the case. 555 U.S. at 810. Thus, a court need not decide whether a constitutional violation occurred before determining whether qualified immunity applies. The Court will, in this action, exercise its discretion and analyze whether the constitutional rights of plaintiff were clearly established.

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting, in part, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The Eleventh Circuit has delineated three methods by which a plaintiff can demonstrate that a constitutional right was clearly established.

> *First*, the plaintiff[] may show that a materially similar case has already been decided. *Second*, the plaintiff[] can point to a broader, clearly established principle that should control the novel facts of the situation. *Finally*, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiff[] must carry [his] burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].

*Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (emphasis in original) (citing *Terrell v. Smith*, 668 F.3d 1244, 1255-56 (11th Cir. 2012)). The second and third categories are known as "obvious clarity" cases. *Id*. These cases exist when the constitutional provision at issue is so clear and the conduct so bad that case law is not needed to establish that it was unlawful, or where the case law that does exist is so clear and broad that every objectively reasonable governmental official facing the circumstances would know that his or her conduct violated federal law. *Id*. Cases do not often arise under the second and third methods. *Id*.

It is not entirely clear to the Court what method plaintiff asserts is at play here. The crux of plaintiff's argument is that Collier "enter[ed] the premises of plaintiff Fuqua, and demanded that he unlock and open the door to his private resident bedroom," and that Collier did not have a search warrant. (Doc. 73, p. 22; *see also* p. 24 ("Defendant Deputy fire marshal Jimmy Collier forced himself upon plaintiff Fuqua and demanded he open the bedroom private area of his premises so he could allegedly inspect for fire safety inspection."); *see also* pp. 25-26 ("Collier clearly violated Fuqua's Fourth Amendment rights of unlawful search and seizure,

when he entered the premises and demanded the unlocking of the bedroom door in the private section and conducted an illegal search . . . .")).  Plaintiff's arguments are largely undeveloped beyond this.  Therefore, the Court assumes that plaintiff is arguing that, because Collier did not have a search warrant to enter his bedroom (or possibly the Pig), his actions violated the Fourth Amendment on their face.  The Court also assumes that plaintiff is arguing that the November 16, 2015, search constituted a conspiracy to subvert the Fourth Amendment by subjecting him to a warrantless search.  And, while not expounded upon in his brief, plaintiff appears to be asserting a claim under 42 U.S.C. § 1985(3)[6] for these same actions.

The Court does not view this as an obvious clarity case.  The Court recognizes that the Supreme Court has "held that warrantless searches are generally unreasonable, and that this rule applies to commercial premises as well

---

[6] 42 U.S.C. § 1985(3) states in full:  If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

as homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978). However, the

Supreme Court has also carved out an exception for administrative searches under

certain circumstances. "[U]nlike searches of private homes, which generally must

be conducted pursuant to a warrant in order to be reasonable under the Fourth

Amendment, legislative schemes authorizing warrantless administrative searches

of commercial property do not necessarily violate the Fourth Amendment."

*Donovan v. Dewey*, 452 U.S. 594, 598 (1981). The Supreme Court has further

stated:

> Because the owner or operator of commercial premises in
> a "closely regulated" industry has a reduced expectation
> of privacy, the warrant and probable-cause requirements,
> which fulfill the traditional Fourth Amendment standard
> of reasonableness for a government search, see *O'Connor
> v. Ortega,* 480 U.S. 709, 741, 107 S. Ct. 1492, ——, 94
> L.Ed.2d 714 (1987) (dissenting opinion), have lessened
> application in this context. Rather, we conclude that, as
> in other situations of "special need," see *New Jersey v.
> T.L.O.,* 469 U.S. 325, 353, 105 S. Ct. 733, 750, 83
> L.Ed.2d 720 (1985) (opinion concurring in judgment),
> where the privacy interests of the owner are weakened
> and the government interests in regulating particular
> businesses are concomitantly heightened, a warrantless
> inspection of commercial premises may well be
> reasonable within the meaning of the Fourth
> Amendment.

*New York v. Burger*, 482 U.S. 691, 702 (1987); *see also Indigo Room, Inc. v. City

of Fort Myers*, 589 F. App'x 938, 945 (11th Cir. 2014) (unpublished opinion)

("Liquor establishments, including nightclubs and bars like the Indigo Room, are

'closely regulated.'") (quoting, in part, *Crosby v. Paulk*, 187 F.3d 1339, 1346-48 (11th Cir. 1999)).

Furthermore, while the Court recognizes that its analysis starts and ends with the Fourth Amendment, not with Alabama law, it notes that Section 36-19-4 of the Alabama Code permits the fire marshal or his deputy to "at all hours enter any building or premises within this state for the purpose of making an investigation or inspection which under the provisions of this article he or they may deem necessary to be made." Additionally, Section 36-19-11 states that the fire marshal or his deputy "upon complaint in writing or any citizen, or whenever he . . . shall deem it necessary, shall inspect at all reasonable hours any and all buildings or premises within their jurisdiction."[7] Under these circumstances, the Court finds that this is not an obvious clarity case. The Fourth Amendment or 42 U.S.C. § 1985(3) do not obviously control the novel facts at issue here. Nor do Collier's actions so obviously violate the Fourth Amendment or 42 U.S.C. § 1985(3) such that no prior case law is necessary.

Nor has plaintiff met his burden to point to a materially similar case that shows Collier's actions with respect to the November 16, 2015, inspection were

---

[7] The Court notes that plaintiff does not contest the constitutionality of these code provisions. *Cf. Swint v. City of Wadley, Ala.*, 51 F.3d 988, 998 (11th Cir. 1995) ("Thus, where an act authorizing administrative inspections 'fails to tailor the scope and frequency of such administrative inspections to the particular' governmental concern, and 'does not provide any standards to guide inspectors either in their selection of establishments to be searched or in the exercise of their authority to search,' a search warrant will be required.").

unconstitutional or violated 42 U.S.C. § 1983(3). The only case cited (but not discussed) by plaintiff that could be possibly be construed as a materially similar case is *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523 (1967). In *Camara*, the appellant had refused to permit inspectors to make a routine annual inspection of his personal residence without a warrant. The appellant was ultimately charged with refusing to permit a lawful inspection; the appellant was then arrested and released on bail. The Supreme Court ultimately concluded that the appellant had a constitutional right to insist that the inspectors obtain a warrant to conduct the inspection and that he could not constitutionally be convicted for refusing to consent to the inspection. In so holding, the Supreme Court disapproved of the administrative searches at issue in *Camara*, namely warrantless inspections of entire municipal areas aimed at securing city-wide compliance with minimum physical standards for private property.

The Court finds that *Camara* is not materially similar to the facts at hand to have made it sufficiently clear to Collier that his actions violated plaintiff's constitutional rights. There is no evidence that plaintiff refused to permit Collier into the Pig or his bedroom for an inspection, or that plaintiff was arrested for refusing to permit Collier to enter the Pig or his bedroom. Collier was not performing a general warrantless inspection of personal residences. Instead, Collier was performing a re-inspection of the Pig based on the code violations that he had discovered on prior inspections, some of which had not been corrected. Thus, the Court finds that

*Camara* did not provide sufficient notice to Collier that his actions were unlawful. *See, e.g.*, *Santamorena v. Georgia Military Coll.*, 147 F.3d 1337, 1342 (11th Cir. 1998) ("Given their facts, the cited precedents gave much too little guidance. We cannot properly require Defendants in this case to have drawn inferences when the facts of the existing cases were considerably different from the circumstances facing these particular Defendants").

Importantly, Collier's intent and motivation are not relevant to the qualified immunity analysis. *See Crosby v. Paulk*, 187 F.3d 1339, 1344–45 (11th Cir. 1999) ("[T]he government actor's intent and motivation are insignificant in determining entitlement to qualified immunity.") (internal citation and quotation marks omitted). "'[S]tate officials can act lawfully even when motivated by a dislike or hostility' if the record shows that they would have acted in the same way without such sentiments." *Id*. (quoting, in part, *Foy v. Holston,* 94 F.3d 1528, 1534 (11th Cir. 1996)). The record evidence shows, that, although the date may have been changed, Collier did, in fact, conduct a fire marshal inspection on November 16, 2015, in his usual manner to check on previously noted code violations.

In sum, because this is not an obvious clarity case and plaintiff has not pointed to a materially similar case giving Collier fair warning that his actions violated federal law, the Court finds that Collier is entitled to qualified immunity with respect to the federal claims. *See, e.g.*, *Brown v. City of Atlanta, Georgia*, No.

18-10436, 2019 WL 2591120, at *2 (11th Cir. June 25, 2019) (unpublished opinion) (finding officers who conducted warrantless check for compliance with city ordinance provisions regarding hours of operation at private motorcycle club were entitled to qualified immunity). Therefore, the Court will grant Collier's motion for summary judgment with respect to Count I, Count I, and Count III of the complaint.

### B. State immunity and state agent / peace officer immunity

Collier argues that he is entitled to summary judgment on the state-law claims for unlawful search, false arrest, and false imprisonment in Count VI due to immunity under Alabama law. The Court pauses to note that, in Count VI of the complaint describing the state-law claims, plaintiff only mentions the September 16, 2015, date specifically. As the Court has noted, in an earlier order it found that claims arising out of the September 16 search are time barred. Plaintiff does allege in Count VI that he was placed under arrest and taken to jail; although plaintiff does not reference any date, the facts show that he was arrested on or about November 16, 2015, not September 16. Because Collier understands Count VI of the complaint to encompass his actions on November 16, 2015 – and has moved for summary judgment on that basis – the Court will consider the state-law claims in the context of Collier's actions on November 16, 2015, only. The Court will not consider any of Collier's actions on September 16, 2015.

### 1. State immunity

Collier argues that all the state-law claims asserted against him are really claims against him in his official capacity and are barred by Section 14 of the Alabama Constitution. Plaintiff does not appear to dispute this. (Doc. 73, p. 9) ("Collier having been sued in both the official and individual capacity, the court having severed the official capacity by way of both the 11th Amendment and the State of Alabama state officials [sic] are immune from claims against them in their official capacity.")). Indeed, under Alabama law, "[a] complaint seeking money damages against a State employee in his or her official capacity is considered a complaint against the State, and such a complaint is barred by Art. I, § 14, Alabama Constitution of 1901." *Ex parte Alabama Dep't of Mental Health & Mental Retardation*, 937 So. 2d 1018, 1023 (Ala. 2006) (internal citation and quotation marks omitted). Instead, plaintiff appears to argue that Collier is liable in his individual capacity under one of the exceptions to state agent / peace officer immunity. (*Id*. at 10-13). The Court will therefore dismiss all state-law claims against Collier in his official capacity and next discuss the applicability of state agent / peace officer immunity.

### 2. State agent / peace officer immunity

Collier argues that, as a peace officer, he is immune from the state-law claims against him in his individual capacity pursuant to Section 6-5-338 of the

Alabama Code.  Section 6-5-338 states that every peace officer "shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  Ala. Code § 6-5-338.  To analyze immunity under Section 6-5-338, the Court must look to the reformulated state agent immunity factors enumerated in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000).  *Blackwood v. City of Hanceville*, 936 So. 2d 495, 504 (Ala. 2006) ("[W]hether a qualified peace officer is due § 6–5–338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex parte Cranman,* 792 So.2d 392 (Ala.2000) . . . .") (internal quotation marks and citation omitted).  State agent immunity "'is a question of law to be decided by the trial court.'" *Suttles v. Roy*, 75 So. 3d 90, 99 (Ala. 2010) (quoting *Ex parte Sawyer*, 984 So. 2d 1100, 1106–07 (Ala. 2007)).

The relevant portion of the reformulated state agent immunity analysis articulated in *Cranman*, as modified by *Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006), states:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> (1)    formulating plans, policies, or designs; or
>
> (2)    exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

(a) making administrative adjudications;

(b) allocating resources;

(c) negotiating contracts;

(d) hiring, firing, transferring, assigning, or supervising personnel; or

(3)    discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4)    exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975; or

(5)    exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

*Hollis*, So. 2d at 309 (quoting, in part, *Cranman*, 792 So. 2d at 405).  Notably, "*Cranman* is a *restatement* of the law of immunity, not a *statute.*"  *Howard v. City of Atmore*, 887 So. 2d 201, 206 (Ala. 2003) (emphasis in original).  Thus*, Cranman,* "states categories, but does not purport to set forth an exhaustive list of activities falling within each category."  *Id.*

Cranman lists two exceptions to the general rule of immunity:

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Id*. at 405.

The Court applies a burden-shifting framework to evaluate the state agent immunity defense. The state agent first bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle him or her to immunity. *Suttles*, 75 So. 2d at 99. "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id*.

It is undisputed that Collier is a deputy fire marshal and has the full, general powers of peace officers under Alabama law. The Court finds that Collier has demonstrated that he was acting within his discretionary authority during his November 16, 2015, inspection of the Pig. As the Court has noted, Alabama law permits a deputy fire marshal to inspect at all reasonable hours all buildings or premises within their jurisdiction. Ala. Code § 36-19-11; *see also* Ala. Code § 36-19-4 (stating that deputy fire marshal may at all hours enter any building or premises within this state for purposes of making an investigation or inspection). Additionally, this does not appear to be disputed by plaintiff.

Because Collier was engaged in a discretionary function on November 16, 2015, the burden now shifts to plaintiff to show that Collier acted willfully,

maliciously, fraudulently, in bad faith, or beyond his or her authority. Plaintiff has not done so. The undisputed facts show that Collier was conducting a follow up inspection at the Pig. Collier's uncontroverted testimony is that he did not expand the scope of his inspection to aid law enforcement agents. Furthermore, plaintiff has not demonstrated that Collier acted beyond his authority by informing the ATF agent about the presence of guns in the Pig or photographing same when doing so did not expand the scope of his inspection. There is no evidence or indication that Collier entered the Pig without plaintiff's permission or over plaintiff's objections. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) ("A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1195 (5th Cir.1986). The evidence presented cannot consist of conclusory allegations or legal conclusions."). Indeed, there is no testimony from plaintiff on this point in the record.

Therefore, the Court concludes that Collier is entitled to immunity from plaintiff's state-law claims against him in his individual capacity pursuant to Section 6-5-338 and the state agent immunity principles enumerated in *Cranman*. Therefore, the Court will grant Collier summary judgment with respect to Count IV of the complaint as well.

## IV.  CONCLUSION

Accordingly,

IT IS ORDERED that the motion for summary (doc. 67) is GRANTED.

A final judgment will be entered separately.

**DONE** and **ORDERED** this August 29, 2019.

_____

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE